Anthony M. Barnes (Bar No. 199048)
Email: amb@atalawgroup.com
Kenya Rothstein (Bar No. 340854)
Email: ksr@atalawgroup.com
Aqua Terra Aeris Law Group
4030 Martin Luther King Jr. Way
Oakland, CA 94609
T: (917) 371-8293

Barak J. Kamelgard (Bar No. 298822)
Email: Barak@lawaterkeeper.org
Benjamin A. Harris (Bar No. 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street Suite 250
Los Angeles, CA 90012
Phone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association,<br><br>                    Plaintiff,<br><br>    v.<br><br>SHIP & SHORE ENVIRONMENTAL, INC., a Nevada Corporation,<br><br>                    Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby allege the following upon information and belief:

# I.   **JURISDICTION AND VENUE**

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). (*See* 33 U.S.C. § 1365.) This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     Pursuant to 40 C.F.R. § 135.2(a)(2), on August 31, 2023, LA Waterkeeper issued a 60-day notice letter (the "Notice Letter"), to Ship & Shore Environmental, Inc. ("Ship & Shore" or "Defendant") as the owner and operator of the industrial facility at 2474 N. Palm Drive, Signal Hill, CA 90755 with Waste Discharger Identification Number 4 19I028525 (the "Facility") [1]. Specifically, the Notice Letter was sent to Ship & Shore's Chief Executive Officer, Controller, personnel contact for Operations, and Registered Agent for Service of Process and return receipts were received.

3.     The Notice Letter was also sent to the U.S Attorney General Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

---

[1] The Facility is fully described in Section V below.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

4.      The Notice Letter informed Defendant of its ongoing violations of substantive and procedural requirements of the CWA, 33 U.S.C. § 1251 *et seq.* and California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Load ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order No. 2018-0028-DWQ incorporating TMDL effluent limits (effective July 1, 2020) (hereafter the "Storm Water Permit" or "General Permit") and the Clean Water Act at the Facility.

5.      The Notice Letter informed Defendant of Plaintiff's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

6.      More than sixty (60) days have passed since both the Notice Letter was served on the Defendant and the State and Federal agencies. Plaintiff is informed and believes, and in turn alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. (*See* 33 U.S.C. § 1365(b)(1)(B).) This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

7.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

8.      Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

## II.   **INTRODUCTION**

9.     With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as "Receiving Waters," are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

10.     Heavy metals, including copper, zinc, and lead that accumulate in lakes, oceans, rivers and streams threaten the environment and can instigate health problems and genetic changes in aquatic life, birds and other animals dependent on these waterbodies. These metals in water cannot be easily metabolized by aquatic organisms and can become enriched in organs such as the liver and kidney. Studies show that heavy metals can enter aquatic animals through their gills or during feeding and bind with substances in the bodies of wildlife. High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments and nitrogen compounds, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

11.     This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.

12.     Plaintiff specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the monitoring, reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

III.     **PARTIES**

   **A. Los Angeles Waterkeeper**

     13.    LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. LA Waterkeeper maintains an office at 360 E. 2nd Street, Suite 250, Los Angeles, California 90012.

     14.    LA Waterkeeper's members live and/or recreate in and around Los Angeles County. LA Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

     15.    LA Waterkeeper members work, own homes and live in Los Angeles County and use and enjoy the waters near the Facility, including the Los Cerritos Channel, the Los Cerritos Estuary, Alamitos Bay and the Pacific Ocean (the "Receiving Waters").[2]   LA Waterkeeper members also use and enjoy the bordering parks, pathways, golf courses, athletic fields, and beaches. They also enjoy and use other connected waterways to bike, boat, kayak, bird watch, ride horses, view wildlife, hike, walk, run, fish, surf, swim, sail, and recreate. LA Waterkeeper members engage in scientific study through pollution and habitat monitoring and restoration activities in and along all these waters.

     16.    Discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Los Cerritos Channel, the Los Cerritos Estuary, Alamitos Bay, the Los Angeles River, San Pedro Bay, and the Pacific Ocean and impair LA Waterkeeper's members use and enjoyment of those waters. The unlawful discharge of pollutants from the Facility requires

---

[2] Alternatively, LA Waterkeeper acknowledges the possibility that storm water from the Facility may discharge to the Los Angeles River Reach 1, which flows into the Los Angeles River Estuary and into Queensway Bay, San Pedro Bay and the Pacific Ocean.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

LA Waterkeeper to expend its limited resources to study and combat pollution from the Facility.

17.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted storm water from the Facility. Thus, the interests Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

18.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

19.     The interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harm to Plaintiff caused by Defendant's activities.

**B. The Owners and/or Operators of the Facility**

20.     Plaintiff is informed and believes, and thereon alleges, that Ship & Shore maintains its principal place of business at 2474 N. Palm Drive, Signal Hill, CA 90755.

21.     Plaintiff is informed and believes, and thereon alleges, that Ship & Shore is an owner and operator of the Facility.

22.     Plaintiff is informed and believes, and thereon alleges, that Ship & Shore was formed in Nevada and is registered in California.

23.     Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Ship & Shore is W. Rod Stern, who is located at 2603 Main Street Penthouse, Irvine, CA 92614.

24.     Plaintiff is informed and believes, and thereon alleges, that the current Chief Executive Officer is Anoosheh Mostafaei.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

25.     Plaintiff is informed and believes, and thereon alleges, that the Controller and Operations personnel are Sophary Sin and Khosrow Shafiayane.

26.     LA Waterkeeper refers to Defendant Ship & Shore and its management herein as the "Owners/Operators" of the Facility.

## IV.   STATUTORY BACKGROUND

### A. The Clean Water Act

27.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342.

28.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p).) States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. §§ 1342(b), (p).)

29.     Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. (*See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).)

30.     The Clean Water Act requires that point source discharges of pollutants to navigable waters be regulated by an NPDES permit. (33 U.S.C. §§ 1311(a), 1342; *see* 40 C.F.R. § 122.26(c)(1).)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

31.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." (33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.)

32.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." (33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.)

33.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." (33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.)

34.     "Navigable waters" means "the waters of the United States." (33 U.S.C. 1362(7); 33 CFR § 328.3.)

35.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." (*See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).)

36.     Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

37.     An action for injunctive relief is authorized under Section 505(a) of the CWA, (33 U.S.C. § 1365(a).)

38.     Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after November 2, 2015, commencing

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

1  five years prior to the date of Notice of Violation and Intent to File Suit subjects

2  each Defendant to a penalty of up to $64,618 per day per violation.

3       39.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d),

4  permits prevailing or substantially prevailing parties to recover litigation costs,

5  including attorneys' fees, experts' fees, and consultants' fees.

6       **B. California's Storm Water Permit**

7       40.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state

8  to administer its own EPA-approved NPDES permit program for regulating the

9  discharge of pollutants, including discharges of polluted storm water. States with

10 approved NPDES permit programs are authorized by Section 402(b) to regulate

11 industrial storm water discharges through individual NPDES permits issued to

12 dischargers and/or through the issuance of a statewide general NPDES permit

13 applicable to all industrial storm water dischargers. (*See* 33 U.S.C. § 1342(b).)

14      41.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the

15 Administrator of the EPA has authorized California to issue NPDES permits,

16 including general NPDES permits. California has designated the State Board and

17 the Regional Boards to administer its NPDES program. (*City of Rancho*

18 *Cucamonga v. Regional Water Quality Control Bd.*, (2006) 135 Cal. App. 4th

19 1377, 1380-81.) In California, the State Board is charged with regulating

20 pollutants to protect California's water resources. (*See* Cal. Water Code § 13001.)

21 The Storm Water Permit is a statewide general NPDES permit issued by the State

22 Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40

23 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the

24 CWA. (Storm Water Permit, Section XXI(A).)

25      42.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt

26 Water Quality Standards, including water quality objectives and beneficial uses

27 for navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA

28 prohibits discharges from causing or contributing to a violation of such state

Water Quality Standards. (*See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).)

43.　　The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

44.　　On July 1, 2015, the current Storm Water Permit became effective and was issued as *NPDES General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ* ("2015 Permit"). (Storm Water Permit, Section I(A) (Finding 4).)

45.　　On November 6, 2018, the State Board amended the Storm Water Permit with Order No. 2015-0122-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

46.　　On July 1, 2020, the State Board subsequently amended the Storm Water Permit with Order No. 2018-0028-DWQ, incorporating TMDL effluent limits ("2020 Permit Amendment").

47.　　In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. (Storm Water Permit, Section I(A) (Findings 8, 12).) Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the Storm Water Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. (Storm Water Permit, Section I(A) (Finding 17), Section II(B).)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

## C. The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

48.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. (Storm Water Permit, Section III(B).)

49.     Effluent Limitations Section V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

50.     Discharge Prohibition Section III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

51.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). (Storm Water Permit, Section V(A).) EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. (*See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).)

52.   The 2015 Multi-Sector Permit parameter Benchmarks, among others, are as follows: ammonia—2.14 mg/L; TSS—100 mg/L; aluminum—0.75 mg/L; nitrate plus nitrite as nitrogen ("N+N")—0.68 mg/L; lead—0.082 mg/L; cyanide—0.022 mg/L; copper—0.014 mg/L; zinc—0.12 mg/L; iron—1.0 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L. The EPA Benchmarks for heavy metals, listed here and below, can vary depending on the hardness of the receiving water, and they also apply to storm water discharges from the Facility.

53.   The EPA's most recent, 2021 Multi-Sector Permit parameter Benchmarks for the following parameters, among others, are as follows: ammonia—2.14 mg/L; TSS—100 mg/L; aluminum—1.1 mg/L; N+N—0.68 mg/L; lead—0.082 mg/L; cyanide—0.022 mg/L; copper—0.00519 mg/L; zinc—0.12 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L.

54.   The Storm Water Permit contains Numeric Action Levels ("NALs") that generally mirror the 2008 EPA Benchmark Values. (*See* Storm Water Permit, Section I(M)(Finding 62).) Annual NALs, not accounting for water hardness, for the following parameters are: ammonia—2.14 mg/L; TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L; nickel—1.02 mg/L; cadmium—0.0053 mg/L; lead—0.262 mg/L; cyanide—0.022 mg/L; iron—1.0 mg/L; N+N—0.68 mg/L; O&G—15 mg/L; aluminum—0.75 mg/L; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L. Storm Water Permit, Table 2 at 47. Instantaneous Maximum NALs, for the following parameters are: pH—6.0 – 9.0 s.u.; TSS—400mg/L; O&G—25mg/L. (*Id.*)

55.   An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year

exceeds the annual NAL value for that parameter. (Storm Water Permit, Section XII(A).)

56. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. (Storm Water Permit, Section XII(A).)

57. Receiving Water Limitation Section VI(B) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment.

58. Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation. (Storm Water Permit, Section VI(B).)

59. Receiving Water Limitation Section VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

60. Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

61. The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

62. The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and

non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, cadmium, N+N, and mercury. (Basin Plan, Table 3-8.) The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. (*Id*. at 3-44.) The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." (*Id*. at 3-29.)

63.    The Basin Plan's WQS also requires a narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as the Los Angeles River and its watershed. (Basin Plan at 3-40.)

64.    The Basin Plan specifies potential, intermittent, and existing beneficial uses for Los Cerritos Channel including municipal and domestic supply; warm freshwater habitat; wildlife habitat. (Basin Plan, Table 2-1.) The Basin Plan further specifies beneficial uses for Reach 1 of the Los Angeles River which include each of the above among additional beneficial uses.

65.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. §1313(d).

66.    Los Cerritos Channel is impaired for chlordane (sediment), lead, trash, indicator bacteria, copper, zinc, Bis(2ethylhexyl)phthalate (DEHP), ammonia, and pH. Downstream, Alamitos Bay is impaired for indicator bacteria and oxygen, dissolved. The draft 2024 report proposes listing Alamitos Bay for copper, DDD, DDT, and PCBs.[3]

67.    In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply

[3] Reach 1 of the Los Angeles River, and the Los Angeles River Estuary and Queensway Bay downstream, are also listed for impairments on the Section 303(d) list.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

1  to the Receiving Waters, unless expressly superseded by the Basin Plan. (40

2  C.F.R. § 131.38.) The CTR sets forth lower numeric limits for zinc and other

3  pollutants; CTR criteria can be as low as, 0.065 mg/L for lead, 0.013 mg/L for

4  copper, 0.022 mg/L for cyanide, 0.0043 mg/L for cadmium, and 0.12 mg/L for

5  zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[4]

6       68.    The CTR includes further numeric criteria set to protect human

7  health and the environment in the State of California. (*See* Establishment of

8  Numeric Criteria for Priority Toxic Pollutants for the State of California

9  Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-

10 tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-

11 pollutants-state.)

12      69.    Discharges with pollutant levels in excess of the CTR criteria, the

13 Basin Plan, and/or other applicable WQS are violations of the Storm Water

14 Permit's Receiving Water Limitations. (*See* Storm Water Permit, Section VI(A).)

15 **D. The Storm Water Permit's Numeric Effluent Limitations**

16      70.    Effective July 1, 2020, the Storm Water Permit establishes numeric

17 effluent limitations ("NELs") for facilities that discharge storm water associated

18 with industrial activities into water bodies that have approved TMDLs set forth in

19 Storm Water Permit, Attachment E. TMDLs in place for pollutants discharged

20 from industrial facilities to Los Cerritos Channel include metals. (Storm Water

21 Permit, Attachment E, Table E-1.) TMDLs in place for pollutants discharged from

22 industrial facilities to the Los Angeles River and its tributaries include nitrogen

23 and metals. (*Id*.)

24      71.    Discharges from the Facility are subject to the Los Cerritos Channel

25 TMDL requirements, which include the following NELs: copper (0.0098 mg/L),

26

27 ───────────────

28 [4] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit requires permittees to report their sample results as total metal concentrations. (*See* Storm Water Permit, Attachment H at ¶ 18.)

lead (0.0558 mg/L), and zinc (0.0956 mg/L). (Storm Water Permit, Attachment E, Table E-2.) The Los Angeles River is also subject to certain NELs.

72.     An exceedance of an NEL constitutes a violation of the General Permit. (General Permit, Attachment C at 5.) An NEL exceedance occurs when two (2) of more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NEL value listed in Table E-2 of Attachment E to the General Permit. (*Id*.)

**E. The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

72.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. (Storm Water Permit, Sections I(I) (Finding 54) and X(B).) The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. (Storm Water Permit, Section X(G).) The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. (Storm Water Permit, Section X(G).) The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. (Storm Water Permit, Section X(H).) The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. (Storm Water Permit, Sections I(D) (Finding 32) and X(C).)

73.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and

pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. (Storm Water Permit, Section X.)

74. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. (Storm Water Permit, Sections X(C)(1), X(H)(1).)

75. The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. (Storm Water Permit, Sections X(A)-(B).) The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. (Storm Water Permit, Sections X(B) and XV.)

76. The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. (Storm Water Permit, Sections

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

I(J) (Finding 55) and X(B)(1).) Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days. (Storm Water Permit, Section X(B)(2).) Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. (Storm Water Permit, Section X(B)(3); Storm Water Permit, Fact Sheet, Section II(I)(1).)

**F. The Storm Water Permit's Monitoring Implementation Program Requirements**

77.     The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). (Storm Water Permit Sections X(I) and XI(A)–(D).) The MIP must ensure that storm water discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. (Storm Water Permit Section XI.) The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. (*Id*.)

78.     Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (Storm Water Permit, Section XI.)

79.     The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. (Storm Water Permit, Section XI.)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

80.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. (Storm Water Permit, Sections I(J) (Findings 55–56) and XI.)

81.     Section XI(A)(4) of the Storm Water Permit requires that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

82.     Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

83.     Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. (*See* Storm Water Permit, Section XI(A)(3).) The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. (Storm Water Permit, Section X(B)(1).)

84.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. (Storm Water Permit, Section XI(B)(4).)

85.     Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

86.     Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

87.     Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with Section 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Board.

88.     All facilities are required to sample storm water for TSS, O&G, and pH. The Facility's NOI classifies the Facility under Standard Industrial Classification Code ("SIC") 3444 and 3569 Ship & Shore is required to sample storm water for total suspended solids ("TSS"), oil and grease ("O&G"), pH, zinc, iron, aluminum, and N+N. In addition, Ship & Shore is required to sample storm water for pH, O&G and TSS. In its SWPPP, Ship & Shore states that it will sample storm water for cadmium, coliform bacteria, cyanide, diazinon, lead, copper, and ammonia because they are Section 303(d) impairments for the Receiving Waters. Yet in practice, Ship & Shore does not in sample for all of these impairments (*i.e.*, coliform, ammonia). Facilities must also sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with Section 303(d) listed impairments. (Storm Water Permit, Section XI(B)(6).) When self-reporting storm water sample results, Defendant did not consistently sample for all the pollutants listed above in this paragraph.

89.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a compliance checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the compliance checklist, an identification,

1    including page numbers and/or Sections, of all revisions made to the SWPPP

2    within the reporting year, and the date(s) of the Annual Evaluation.

3    **G. Exceedance Response Action Requirements**

4    90.     When the 2015 Permit became effective on July 1, 2015, all

5    permittees were in "Baseline status." (*See* Storm Water Permit, Section XII(B).) A

6    permittee's Baseline status for any given parameter changes to "Level 1 status" if

7    sampling results indicate a NAL exceedance for that same parameter. (*See* Storm

8    Water Permit, Section XII(C).)

9    91.     Level 1 status commences on July 1 following the reporting year

10   during which the exceedance(s) occurred. (*See* Storm Water Permit, Section

11   XII(C).) By October 1 following commencement of Level 1 status, permittees are

12   required to: complete an evaluation, with the assistance of a Qualified Industrial

13   Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility

14   that are or may be related to the NAL exceedance(s); and identify in the

15   evaluation the corresponding BMPs in the SWPPP and any additional BMPs and

16   SWPPP revisions necessary to prevent future NAL exceedances and to comply

17   with the requirements of Storm Water Permit. (*See* Storm Water Permit Section

18   XII(C)(1)(a)-(c).)

19   92.     Although the Level 1 status evaluation may focus on the drainage

20   areas where the NAL exceedance(s) occurred, all drainage areas shall be

21   evaluated. (*See* Storm Water Permit, Section XII(C)(1)(c).)

22   93.     Based upon this Level 1 status evaluation, the permittee is required

23   to, as soon as practicable but no later than January 1 following commencement of

24   Level 1 status, revise the SWPPP as necessary and implement any additional

25   BMPs identified in the evaluation, and certify and submit via SMARTS a Level 1

26   Exceedance Response Action ("ERA") Report prepared by a QISP that includes

27   the a summary of the Level 1 ERA Evaluation and a detailed description of the

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

1  SWPPP revisions and any additional BMPs for each parameter that exceeded an

2  NAL. (*See* Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).)

3    94.   The permittee in Level 1 status must also certify and submit via

4  SMARTS the QISP's identification number, name, and contact information

5  (telephone number, e-mail address) no later than January 1 following

6  commencement of Level 1 status. (*See* Storm Water Permit, Section

7  XII(C)(2)(a)(iii).)

8    95.   A permittee's Level 1 status for a parameter will return to Baseline

9  status once a Level 1 ERA Report has been completed, all identified additional

10  BMPs have been implemented, and results from four (4) consecutive qualified

11  storm events that were sampled subsequent to BMP implementation indicate no

12  additional NAL exceedances for that parameter. (*See* Storm Water Permit, Section

13  XII(C)(2)(b).)

14    96.   A permittee's Level 1 status for any given parameter shall change to

15  Level 2 status if sampling results indicate an NAL exceedance for that same

16  parameter while the discharger is in Level 1 status. Level 2 status commences on

17  July 1 following the reporting year during which the NAL exceedance(s) occurred

18  while the discharger was in Level 1 status. (*See* Storm Water Permit, Section

19  XII(D).)

20    97.   A discharger in Level 2 status shall submit a Level 2 ERA Action

21  Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by

22  January 1 following the reporting year during with the NAL exceedances occurred

23  while the discharger was in Level 1 status. On January 1 of the reporting year

24  following the submittal of the Level 2 ERA Action Plan, a discharger shall certify

25  and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS.

26  (*See*, Storm Water Permit, Section XII(D).)

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

# V. STATEMENT OF FACTS

## A. Ship & Shore Facility Site Description, Industrial Activities, and Pollutant Sources at the Facility

98.     Defendant operates an industrial facility located at 2474 N. Palm Drive, Signal Hill, CA 90755, in between the Los Cerritos Channel and the Los Angeles River.

99.     The Facility's primary industrial purpose is the engineering and fabrication of pollution abatement products such as industrial scrubbers and oxidizers.

100.    The Facility's SWPPP most recent SWPPP dated January 2020 ("Facility SWPPP") identifies one (1) building on the property and notes that the site is approximately 54,356 square feet, with 38,467 square feet of industrial areas exposed to storm water. The Facility SWPPP also states that the site is approximately 70% impervious—with asphalt or concrete areas, which includes the rooftop, with the remaining 30% of the site composed of curbed surface areas covered with tress, landscape material and/or sediment.

101.    The Facility SWPPP notes that the Ship & Shore facility operates 5 days per week, Monday through Friday, from 8:00 am to 3:30 pm, with variations in actual operating hours occurring as necessary.

102.    Ship & Shore submitted its Notice of Intent to comply with the general permit on January 6, 2020. Based on information and belief, LA Waterkeeper alleges that Ship & Shore was subject to the Storm Water Permit and therefore required to submit its Notice of Intent to Comply with the General Permit far earlier. Operations at the Facility located at 2474 N. Palm Drive in Signal Hill have been ongoing since December 2000 when Ship & Shore filed a Statement and Designation by a Foreign Corporation with the California Secretary of State's Office.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

103.   Ship & Shore engineers and fabricates pollution abatement products. Plaintiff is informed and believes, and thereon alleges, that industrial activities at the Facility—many of them conducted outdoors and exposed to storm water—include, but are not limited to, designing and fabricating air pollution abatement equipment with production processes involving cutting, shaping, welding, insulating, and painting of carbon steel. Other industrial activities at the Facility include forklift traffic, receiving and storing materials and equipment, and maintenance activities.

104.   The industrial areas and associated activities generate and release pollutants at the Facility which are discharged into storm water.

105.   Pollutants from these activities accumulate at the Facility and contribute to pollutants in storm water. Pollutants of concern at the Facility include but are not limited to O&G, metals, TSS, pH, and organic materials. These pollutants are subject to tracking to other areas of the Facility, and offsite of the Facility by employees, transfer of industrial materials between work areas and warehouses, loading and unloading of industrial materials, vehicle and forklift traffic, use of heavy industrial equipment, and aerial deposition.

106.   The Facility SWPPP notes that storm water flows into a catch basin at the Facility that ultimately discharges to the Los Angeles River Reach 1. LA Waterkeeper, based upon information and belief, including a July 27, 2022 Notice of Violation from the Regional Board charging NEL Violations for discharges to the Los Cerritos Channel, understands the storm water discharge to flow into the Los Cerritos Channel.

107.   The Facility SWPPP describes that the Facility is divided into three (3) drainage areas: northside, southside and westside. There are no storm drains located on the Facility property. Storm water originating from rear or southeast side of the Facility, including the production area, painting area, and welding and fabrication areas flows east to a swale and then north to the Facility's discharge

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

point located in the front of the Facility where it enters the City of Signal Hill municipal separate storm sewer system ("MS4"). Storm water originating from the north and west side of the main Facility building flows through an employee parking lot and to the Facility discharge point and into the MS4. Storm water runoff from the northeast side of the Facility discharges directly to the N. Palm Drive via a gutter on the north side of the Facility parking lot and then into the MS4. Upon information and belief, the MS4 flows into the Los Cerritos Channel, which empties into the Los Cerritos Estuary, flows into Alamitos Bay, and into the Pacific Ocean.

108.   The Los Cerritos Channel, the Los Cerritos Estuary, Alamitos Bay and the Pacific Ocean are waters of the United States with the definition of the CWA.

**B. Los Cerritos Channel, Los Cerritos Estuary, and Alamitos Bay**

109.   LA Waterkeeper's members utilize the Receiving Waters for recreation, scientific study through pollution and habitat monitoring and restoration activities. LA Waterkeeper monitors the water quality, insect populations, and habitat at multiple locations in the Los Cerritos Channel and Los Angeles River.

110.   Wetlands exist adjacent to and connect to the Los Cerritos Estuary a short distance from the lower end of the Los Cerritos Channel. These wetlands, and the portion of the estuary near the wetlands, are areas for a great diversity of birds over the winter months. The endangered species, Belding's Savannah Sparrow, has nested in the wetlands adjacent to the Los Cerritos Estuary and is an historic least tern colony site. A small marina located in the estuary is also a popular fishing area.

111.   Alamitos Bay is home to a marine stadium recreation facility built in 1932 and used for boating, water skiing, and jet skiing. A marina is also hosted within Alamitos Bay and contains small basins for recreational craft and a

1   boatyard. Alamitos Bay also features small canals, a bathing beach, and several

2   clamming areas.

3   **C. The Facility Storm Water Permit Coverage**

4   112.   SMARTS lists the current Facility WDID number for the Facility as

5   4 19I028525 and coverage under the Storm Water Permit as "Active."

6   113.   The NOI for the Facility lists the Receiving Water as the "Los

7   Angeles River Reach 1." As mentioned above, LA Waterkeeper is informed and

8   believes the Facility discharges to the Los Cerritos Channel.

9   114.   Via a search of the SMARTS database, Plaintiff obtained the Facility

10   SWPPP for the Facility, last revised in January 2020.

11   115.   Plaintiff is informed and believes, and thereon alleges, that Defendant

12   has been operating with an inadequately developed or implemented SWPPP in

13   violation of Storm Water Permit requirements since at least August 31, 2018.

14   Defendant has failed to evaluate the effectiveness of its BMPs and to revise its

15   SWPPP as necessary, resulting in the Facility's unlawful effluent limitation

16   violations.

17   116.   Plaintiff is informed and believes, and thereon alleges, that the

18   Facility Owners/Operators failed to implement any additional BMPs as required

19   by the Storm Water Permit. As such, the Owners and/or Operators are in daily

20   violation of this requirement of the Storm Water Permit.

21   117.   Plaintiff is informed and believes, and thereon alleges, that the

22   Facility Owners/Operators have failed to implement BMPs that achieve

23   compliance with Storm Water Permit or the CWA.

24   118.   Plaintiff is informed and believes, and thereon alleges, that pollutants

25   associated with the Facility include, but are not limited to: O&G, TSS, and pH,

26   copper, iron, lead, TSS, N+N, pH, zinc, cyanide, ammonia, diazinon, coliform,

27   and cadmium.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

119.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to implement the minimum BMPs required by the Storm Water Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. (Storm Water Permit, Sections X(H)(1)(a)–(g).) The BMPs that are described in the Facility's SWPPP are insufficient to prevent the NAL and NEL exceedances occurring at the Facility. As evidenced by the sample results, the current BMPs at the Facility are inefficient, and the Facility's Monitoring Implementation Plan needs improvement.

120.    Plaintiff is informed and believes, and thereon alleges, that Ship & Shore has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. (Storm Water Permit X.H.2.) The most recent BMPs identified in the 2022-2023 Level 2 ERA Action Plan for iron, N+N, copper and zinc are not sufficient because exceedances are still occurring for each of those constituents. These BMPs are insufficient to achieve compliance with the General Permit.

121.    Plaintiff is informed and believes, and thereon alleges, that there are also insufficient minimum BMPs implemented, such as good housekeeping.

122.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, and has failed to sample for all pollutants present at the Facility, in violation of the Storm Water Permit, since at least August 31, 2018.

123.    Plaintiff is informed and believes, and thereon alleges, that storm water discharges containing excess levels of iron, TSS, zinc, copper, N+N, pH,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

and cyanide occur each time storm water discharges from Facility in violation of the Storm Water Permit Sections III(C)–(D) and VI(A)–(B).

124. Plaintiff is informed and believes, and thereon alleges, that the repeated and significant exceedances of NALs and Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

125. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

126. Plaintiff is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

127. Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted storm water from Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

128. Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from Facility into the Receiving Waters.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

**D. Storm Water Discharges from the Facility**

129.   As discussed above and as detailed in the Facility SWPPP, there are three discharge points at the Facility where storm water leaves the Facility and is discharged into the Los Cerritos Channel, the Los Cerritos Estuary, Alamitos Bay, and ultimately the Pacific Ocean.

130.   Plaintiff is informed and believes, and thereon alleges, that Ship & Shore has self-reported NAL and NEL exceedances from the Facility over the past five (5) reporting years.

**E. The Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

131.   Plaintiff is informed and believes, and thereon alleges, that pollutants from the Facility discharge with storm water to the Los Cerritos Channel, Alamitos Bay and the Pacific Ocean.[5]

132.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows into the Los Cerritos Channel, Alamitos Bay, and the Pacific Ocean, all waters of the United States.

133.   Storm water discharges containing pollutants including, but not limited to, heavy metals such as zinc, lead, and copper, and iron adversely affect the aquatic environment.

134.   Samples of storm water discharges collected at the Facility contain pollutants including iron, TSS, zinc, copper, N+N, pH, and cyanide in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and/or the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

---

[5] LA Waterkeeper again acknowledges the possibility that storm water discharges from the Facility might enter the Los Angeles River Reach 1, and then flow to the Los Angeles River Estuary, Queensway Bay, San Pedro Bay, and the Pacific Ocean.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

135.   Plaintiff is informed and believes, and thereon alleges, that during and/or after every significant rain event (a rain event of 0.1 inches or more will generally produce storm water runoff from industrial facilities) at the Facility since August 31, 2018, through the present, Defendant has discharged and continues to discharge storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the technology-based Effluent Limitations, the Benchmarks, CTR, and/or the WQS.

**F. Defendant's Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements**

136.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to develop an adequate MIP for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

137.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

138.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to implement the MIP at the Facility, in violation of Section XI of the Storm Water Permit.

139.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

140.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

141.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to prepare, implement, and report on its Water Quality Based Corrective Actions as required by the Storm Water Permit.

142.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

143.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators did not report its non-compliance as required by the Storm Water Permit.

144.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility fail to collect sufficient storm water samples during QSEs.

145.   Based on information available to Plaintiff, it is informed and believes, and thereon alleges, that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

146.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to submit accurate Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the Storm Water Permit.

147.   Plaintiff is informed and believes, and thereon alleges, that during the 2020-2021 reporting year the Facility entered Level 1 status for iron.

148.   Plaintiff is informed and believes, and thereon alleges, that the Level 1 ERA evaluation report detailed deficiencies at the Facility, including material tracking in areas near the drain into discharge point #1; fine particles generated throughout the Facility potentially tracking fine metal chips from the fabrication bay and welding bay where they are mobilized by storm water and discharged

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

from the Facility; industrial debris and metal shavings were around workstations; metal materials stored outdoors showed rust and corrosion; there was a misuse of spray-painting activities; waste bins at loading capacity exposing erodible materials to storm water; no secondary containment in the painting area; cracked and eroded asphalt and loose gravel.

149.   Plaintiff is informed and believes, and thereon alleges, that because the Owners/Operators only analyzed one storm water sample in the 2021-2022 reporting year, they avoided Level 2 status for iron or Level 1 status for other constituents.

150.   Plaintiff is informed and believes, and thereon alleges, that during the 2022-2023 reporting year, the Facility entered Level 1 status for N+N, copper and zinc; and stayed at Level 1 status for iron.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

151.   Plaintiff incorporate the allegations contained in the above paragraphs as though fully set forth herein.

152.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

153.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the

1  CWA. (*See* Storm Water Permit, Sections I(D) (Finding 32)V(A); 33 U.S.C. §
2  1311(b).)

3     154.   The Owners/Operators violate and will continue to violate the Storm
4  Water Permit's Effluent Limitations each and every time storm water containing
5  levels of pollutants that do not achieve BAT/BCT standards discharges from the
6  Facility.

7     155.   Plaintiff is informed and believes, and thereon alleges, that the
8  Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit
9  and the CWA are ongoing and continuous.

10    156.   Each day, since at least August 31, 2018, that the Owners/Operators
11  discharge storm water containing pollutants in violation of the Storm Water
12  Permit is a separate and distinct violation of Section 301(a) of the CWA, 33
13  U.S.C. § 1311(a).

14    157.   By committing the acts and omissions alleged above, the
15  Owners/Operators are subject to an assessment of civil penalties for each and
16  every violation of the CWA occurring from August 31, 2018 to the present,
17  pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365,
18  and 40 C.F.R. § 19.4.

19    158.   An action for injunctive relief is authorized by CWA Section 505(a),
20  33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged
21  above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of
22  the State of California, for which harm Plaintiff have no plain, speedy, or adequate
23  remedy at law.

24    159.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)
25  because an actual controversy exists as to the rights and other legal relations of the
26  Parties.

27    160.   WHEREFORE, Plaintiff prays for judgment against Defendant as set
28  forth hereafter.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

### SECOND CAUSE OF ACTION
**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Numeric Effluent Limitations.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

157. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

158. Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to comply with the Storm Water Permit's Numeric Effluent Limitations.

159. Plaintiff is informed and believes, and thereon alleges, that Defendant violates, and will continue to violate the Storm Water Permit's Numeric Effluent Limitations each day that storm water discharges from the Facility. (Storm Water Permit, Section V(C).)

160. Plaintiff is informed and believes, and thereon alleges, that Defendant violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

161. Plaintiff is informed and believes, and thereon alleges, that Defendant's acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

162. Plaintiff alleges that its members have been harmed by Defendant's acts and omissions described herein and have standing to bring this suit.

163. Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). 151. By committing the acts and omissions alleged above, Defendant are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 31, 2018, to the present, pursuant to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

164.     An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

165.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

166.     WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## THIRD CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water**
**in Violation of the Storm Water Permit's**
**Receiving Water Limitations and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

161.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

162.     Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

163.     Plaintiff is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards, including but not limited to standards set forth in the applicable Basin Plan, has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

164.     The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water

containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS discharges from the Facility.

165.    Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

166.    Each and every violation of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

167.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 31, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

168.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

169.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

170.    WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

# FOURTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollutant Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

167.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

168.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

169.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

170.   Plaintiff is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

171.   The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from August 31, 2018, to the present.

172.   The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

173.   The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

174.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

175.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 31, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

and 40 C.F.R. § 19.4.

176.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

177.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

178.    WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act. U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

179.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

180.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

181.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

182.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

183.    The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from August 31, 2018,

1  to the present.

2      184.   The Owners'/Operators' violations of its Storm Water Permit's

3  monitoring requirements and the CWA at the Facility are ongoing and continuous.

4      185.   The Owners/Operators will continue to be in violation of Section XI

5  of the Storm Water Permit, and the CWA, each and every day they fail to

6  adequately develop, implement, and/or revise an MIP for the Facility.

7      186.   Each and every violation of the Storm Water Permit's MIP

8  requirements at the Facility is a separate and distinct violation of the CWA.

9      187.   By committing the acts and omissions alleged above, the

10  Owners/Operators are subject to an assessment of civil penalties for each and

11  every violation of the CWA occurring from August 31, 2018, to the present,

12  pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365,

13  and 40 C.F.R. § 19.4.

14      188.   An action for injunctive relief under the CWA is authorized by

15  Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the

16  acts and omissions alleged above would irreparably harm Plaintiff, their members,

17  and the citizens of the State of California, for which harm they have no plain,

18  speedy, or adequate remedy at law.

19      189.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

20  because an actual controversy exists as to the rights and other legal relations of the

21  Parties.

22      190.   WHEREFORE, Plaintiff prays for judgment against Defendant as set

23  forth hereafter.

## SIXTH CAUSE OF ACTION
**Defendant's Failure to Report as Required by the Storm Water
Permit in Violation of the Storm Water Permit and the
Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

    191.   Plaintiff incorporates the allegations contained in the above

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

paragraphs as though fully set forth herein.

192.    Section XVI of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation of any non-compliance, an identification of all revisions made to the SWPPP within the reporting year, and the date of the Annual Evaluation. Storm Water Permit, Section XVI. Laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required are also reporting requirements throughout the reporting year and are typically uploaded into the SMARTS portal.

193.    The Permit also requires a permittee whose discharges violate the Storm Water Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TMDL-Specific Numeric Action Levels and NELs to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX(B) of the Permit and report to the Regional Board regarding same. (*See* Storm Water Permit, Section XX(B).)

194.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report its non-compliance with the Storm Water Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. As such, Defendant is in daily violation of the Storm Water Permit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

195.   Further, Defendant has repeatedly failed to submit required ERA Level 1 and/or Level 2 Reports, despite entering into those levels for various constituents. As such, Defendant is in daily violation of the Storm Water Permit Section XII.

196.   The Facility Owners/Operators have been in violation of Sections XII, XVI and XX of the Storm Water Permit since at least August 31, 2018.

197.   The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

198.   By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 31, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

199.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

200.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

201.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   **RELIEF REQUESTED**

202.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

    **a.**   A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

U.S.C. §§ 1311(a) and (b) and 1342, for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

**b.**     A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

**c.**     A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015, of $64,618 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

**d.**     A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

**e.**     Any other relief as this Court may deem appropriate.


Dated: November 1, 2023                           Respectfully submitted,


                                        _____
                                        Anthony M. Barnes
                                        Kenya S. Rothstein
                                        ATA LAW GROUP

                                        Attorneys for Plaintiff

                                        LOS ANGELES WATERKEEPER

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES